IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TUSHANA ROZELLA JACOBS, | ) | CASE NO. 1:18-cv-02485 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tushana Rozella Jacobs (Plaintiff" or "Jacobs") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On September 5, 2014, Jacobs protectively filed applications for DIB and SSI.[1]  Tr. 15, 230-242.  Jacobs alleged a disability onset date of January 16, 2014, (Tr. 15, 230, 237), based on lupus, back problems, neck problems, knee problems, ankle problems, hand/wrist problems,

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 3/18/2020).

elbow problems, rheumatoid arthritis, memory and concentration problems (Tr. 79-80, 103, 127, 146, 271). After initial denial by the state agency (Tr. 127-142) and denial upon reconsideration (Tr. 146-157), Jacobs requested a hearing (Tr. 158-160). On January 11, 2017, a hearing was held before an Administrative Law Judge ("ALJ").[2] Tr. 30-58.

On February 23, 2017, the ALJ issued a decision unfavorable to Jacobs (Tr. 12-29), finding that she had not been under a disability within the meaning of the Social Security Act from January 16, 2014, through the date of the decision (Tr. 15, 23-24). Jacobs requested review of the ALJ's decision by the Appeals Council. Tr. 224-229. On September 5, 2018, the Appeals Council denied Jacobs' request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A. Personal, educational, and vocational evidence

Jacobs was born in 1987. Tr. 22, 230. Jacobs has two daughters – ages 7 and 10 at the time of hearing. Tr. 32. Jacobs last worked in 2013 as a shampoo assistant/supply clerk. Tr. 31, 39, 51-52.

### B. Medical evidence

#### 1. Treatment history[3]

On February 7, 2014, Jacobs saw resident Dr. Raymond Ng, M.D., for complaints of generalized soreness, stiffness, cramping, and pain in the hands (wrist and palms), shins, back of ankles, dorsal feet, back, buttocks (shooting into hamstrings), elbow, and back of knee. Tr. 342-

---

[2] It appears that there are 7 pages missing from the hearing transcript (pages 1-6, 8). Plaintiff indicates that she does not believe that the missing pages are material to the analysis of the issues she raises in this appeal. Doc. 15, p. 3, n. 2.

[3] Jacobs treatment was generally through University Hospitals.

346.  Jacobs reported dry skin, fatigue, trouble sleeping, hair loss, and being cold.  Tr. 342.  On physical examination, Dr. Ng observed normal tone, full range of motion, motor/sensory was 5/5, tenderness on right wrist on Phalen's test, Tinnel signs negative, and mild soreness in wrists, knees, and ankles.  Tr. 344.  Dr. Ng ordered various tests, noting that Jacobs' presentation was concerning for vitamin D deficiency vs. anemia vs. thyroid disorder vs. fibromyalgia vs. connective tissue disorder.  Tr. 346.  Jacobs continued to see medical providers for follow up regarding her joint pain later in February and in April 2014.  Tr. 347-355.

During a visit on May 2, 2014, with Dr. Mohammad Umair Malik, M.D., for follow up regarding abnormal blood results, Dr. Malik informed Jacobs of a diagnosis of systemic lupus erythematosus (SLE).  Tr. 360-364.  Jacobs continued to complain of persistent multi-joint pain and stiffness.  Tr. 360.  On physical examination, no joint swelling was seen, there was normal movement in all extremities, range of motion was normal, and muscle strength and tone were normal.  Tr. 362.  Jacobs was provided with a prescription for a 7-day course of prednisone and she was referred to rheumatology for further evaluation.  Tr. 363.

Jacobs saw Dr. Padmapriya Sivaraman, M.D., in rheumatology on June 17, 2014, for evaluation of positive ANA test, diffuse arthralgias and positive rheumatoid factor.  Tr. 455-461.  Jacobs reported a history of joint pain with associated morning stiffness lasting more than one hour and intermittent episodes of joint swelling in the bilateral hands and feet.  Tr. 455.  Jacobs reported difficulty with routine daily activities and intermittent episodes of fevers, fatigue, oral ulcers, alopecia, and a history of pleurisy and Raynaud's.  Tr. 455.  Dr. Sivaraman felt that the likely etiology of her current symptoms was "related to overlap syndrome with systemic lupus and rheumatoid arthritis."  Tr. 461.  Dr. Sivaraman started Jacobs on hydroxychloroquine 200 mg once daily and also prescribed a Medrol Dosepak and instructed Jacobs to continue on 5 mg

prednisone daily.  Tr. 461.  Dr. Sivaraman indicated that they might consider adding methotrexate to Jacobs' medication in the future.  Tr. 461.

Jacobs saw Dr. Sivaraman on July 30, 2014.  Tr. 449-454. Dr. Sivaraman noted that Jacobs had been started on methotrexate (4 tablets once weekly) since her last visit.  Tr. 449. She was also taking hydroxychloroquine 200 mg once daily and prednisone 5 mg daily.  Tr. 449. Jacobs was tolerating her medications without any adverse effects.  Tr. 449.  Overall, Jacobs' joints symptoms had improved with her medications but she was continuing to report intermittent episode of right-hand pain and right-elbow pain.  Tr. 449.  On physical examination, Dr. Sivaraman observed mild warmth in Jacobs' right elbow with no active joint effusion and normal joint examination of the bilateral hands, wrists, hips, knees, ankles, feet, and shoulders. Tr. 451-452.  Dr. Sivaraman added folic acid 1 mg daily to Jacobs' medications and increased the prednisone to 10 mg daily for four days and then 5 mg daily.  Tr. 454.

On August 15, 2014, Jacobs saw Dr. Farhan Rehman, M.D., following exposure to mold in her apartment.  Tr. 370.  During a physical examination, Dr. Rehman observed a normal gait and station, no joint swelling, and normal movements of all extremities.  Tr. 372.  Dr. Rehman found no symptoms of exposure, allergy or infection.  Tr. 373.

Jacobs saw Dr. Sivaraman on September 22, 2014, for follow up.  Tr. 442-448.  Since her last visit, Jacobs had intermittent episodes of joint stiffness and swelling of the bilateral ankles.  Tr. 442.  Jacobs' joint pain of her bilateral hands and wrists and knees had improved. Tr. 442.  On physical examination, Dr. Sivaraman observed mild swelling of the bilateral ankles without any active joint effusion.  Tr. 444.  There was no evidence of active joint swelling, warmth or erythema in other joints.  Tr. 444.  Dr. Sivaraman increased Jacobs' methotrexate

4

from 4 tablets once weekly to 6 tablets once weekly and decreased prednisone to 2.5 mg daily. Tr. 448.

Jacobs saw Dr. Sivaraman on December 16, 2014, for follow up.  Tr. 435-441.  Jacobs reported joint pain in her left ankle and intermittent episodes of stiffness of the left ankle with swelling but Jacobs' other joint symptoms had resolved with her current medications.  Tr. 435. On physical examination, Dr. Sivaraman observed no active joint swelling, erythema, and no synovitis of the bilateral upper and lower extremities.  Tr. 438.  Dr. Sivaraman continued Jacobs' medications, increasing her methotrexate to 8 tablets once weekly.  Tr. 441.

When Jacobs saw Dr. Sivaraman on March 24, 2015, for follow up, Jacobs reported intermittent episodes of joint pain involving bilateral elbows and knees with intermittent episodes of joint swelling.  Tr. 551.  Jacobs was tolerating her medications without adverse effects.  Tr. 551.   On physical examination, Dr. Sivaraman observed no active joint swelling, erythema, no synovitis of the bilateral upper and lower extremities, and no focal neurological deficits.  Tr. 554.  Dr. Sivaraman continued Jacobs' medications.  Tr. 557.

Jacobs saw Dr. Sivaraman on June 23, 2015, and reported right elbow pain and swelling, bilateral ankle pain and swelling which seemed to be getting progressively worse.  Tr. 546. Jacobs was having difficulty with flexion and extension of her right elbow.  Tr. 546.  On physical examination, in the right elbow, Dr. Sivaraman observed mild swelling, no warmth, no active joint effusion, and limited flexion/extension; mild swelling in the bilateral ankles; joint examinations in bilateral hands, wrists, left elbow and bilateral shoulders were normal; and no focal neurological deficits.  Tr. 549.  Dr. Sivaraman made some adjustments to Jacobs' medications and administered a 40 mg IM Kenalog injection.  Tr. 550.

On November 11, 2015, Jacobs saw Dr. Maya Mattar, M.D.[4]  Tr. 540-545.  Jacobs reported 70% improvement on her current immunosuppressive regimen but was continuing to have three bad days in a one-week period.  Tr. 540.  Jacobs reported pain in her right elbow, wrists and ankles, which she rated 8/10; pain was worse in the morning and improved as the day progressed but worsened again at night.  Tr. 540.  Jacobs had stiffness in the morning for 45 minutes to an hour.  Tr. 540.  On physical examination, Dr. Mattar observed joint swelling over Jacobs' left wrist, right elbow with mild warmth, effusion, and flexion contracture 3-5 degrees.  Tr. 543.  Otherwise, there was no active joint swelling, warmth or erythema over the right wrist, left elbow, shoulders, hips, knees, and ankles; motor strength was 5/5 in the bilateral upper and lower extremities; and no focal neurological deficits.  Tr. 543.  Dr. Mattar continued the methotrexate, hydroxychloroquine, and prednisone and added SSZ 500 mg one tablet twice daily for one week and, if tolerated well, two tablets twice daily.  Tr. 544.

Jacobs saw Dr. Mattar again on January 11, 2016, for follow up.  Tr. 535-539.  Jacobs reported pain in her right elbow, wrists, and ankles and occasional knee pain.  Tr. 535.  Her pain level was 8/10 with associated joint swelling that was worse in the morning.  Tr. 535.  Jacobs had morning stiffness for 30-35 minutes.  Tr. 535.  On physical examination, Dr. Mattar observed synovitis over the left wrist and right elbow with limited flexion/extension of the left wrist; tenderness to palpation of the left ankle but with no active synovitis; and 5/5 motor strength in the bilateral upper and lower extremities.  Tr. 538.  Dr. Mattar recommended rituximab but Jacobs declined due to concerns over side effects so Dr. Mattar indicated that she would seek prior authorization to start Jacobs on Xeljanz.  Tr. 539.

---

[4] Jacobs transitioned to Dr. Mattar when Dr. Sivaraman left the practice.  Tr. 48.

Jacobs saw Dr. Mattar on June 17, 2016, after having started on Xeljanz.  Tr. 523-528.
Jacobs reported that she was feeling better while on Xejanz but complained of right elbow, left
wrist, and left ankle pain that was 6/10 in intensity and worse in the morning and after activities.
Tr. 523.  Jacobs had stiffness in the morning for 15 minutes and intermittent swelling in her
ankles, wrists, and right elbow.  Tr. 523.  On physical examination, Dr. Mattar observed synovial
proliferation in the left wrist and right elbow and tenderness; mild effusion in left shoulder and
tenderness; no active synovitis in other upper or lower extremity joints; 5/5 motor strength in
upper and lower extremities; and no focal neurological deficits.  Tr. 526.  Dr. Mattar noted that
Jacobs was improved on her current regimen but she continued to have "mild disease activity
given synovial proliferation [of the] left wrist, right elbow and left shoulder as well as having
many days with am stiffness and arthritis."  Tr. 527.  Dr. Mattar continued Jacobs on her
medications.  Tr. 527.  Dr. Mattar noted that she would complete Jacobs' social security
questionnaire.  Tr. 527.

Jacobs saw Dr. Mattar again on September 2, 2016.  Tr. 514-522.  Jacobs reported 80-
85% improvement on her current regimen compared to her initial presentation.  Tr. 514.  Since
starting on Xeljanz in June, Jacobs reported having 12 bad days out of a month with morning
stiffness for 15 minutes and 4 flare-ups since her last visit mainly with stiffness in the neck and
swelling in her ankles.  Tr. 514.  Dr. Mattar observed synovial proliferation in the left wrist; full
range of motion in the elbows; good fists and grips; left ankle with tenderness to palpation but
not active synovitis; mild joint hypermobility; 5/5 motor strength in the bilateral upper and lower
extremities; and no focal neurological deficits.  Tr. 517.  Dr. Mattar discontinued prednisone and
continued all other medications.  Tr. 521.

## 2. Opinion evidence

### *Treating source*

On June 19, 2016, Dr. Mattar completed a Lupus (SLE) Residual Functional Capacity Questionnaire.  Tr. 475-477.  Dr. Mattar reported that she had been treating Jacobs since July 2015 and Jacobs' diagnoses included SLE and rheumatoid arthritis.  Tr. 475.  Dr. Mattar listed various clinical findings, laboratory results, symptoms and signs of Jacobs' impairments, including malar rash (over cheeks), discoid rash, photosensitivity, oral ulcers, non-erosive arthritis involving pain in two or more peripheral joints, and severe fatigue.  Tr. 475.  Dr. Mattar noted that the joints affected included wrists, elbows, knees and ankles.  Tr. 475.  Dr. Mattar opined that Jacobs' symptoms were severe enough to interfere "often" with attention and concentration.  Tr. 475.  Dr. Mattar opined that Jacobs could tolerate low stress jobs.  Tr. 476.  Dr. Mattar noted that Jacobs' prognosis was good.  Tr. 476.

As far as functional limitations, Dr. Mattar opined that Jacobs could sit and stand/walk for less than 2 hours in an 8-hour workday and Jacobs would require a job that would permit shifting positions at will from sitting to standing or walking.  Tr. 476.  Dr. Mattar opined that Jacobs would need to take unscheduled breaks during an 8-hour day which would be unpredictable and dependent upon flare-ups which could occur 0-3 times per month.  Tr. 476.  During a break, Jacobs would need to lie down or sit quietly.  Tr. 476.  Jacobs would have to rest for 1-3 days before returning to work following an unscheduled break.  Tr. 476.  Dr. Mattar opined that Jacobs could frequently lift and carry 10 pounds and less and she could rarely lift and carry 20-50 pounds.  Tr. 476.  Jacobs could occasionally stoop, crouch, climb ladders, and climb stairs.  Tr. 476-477.  Jacobs would need to avoid all exposure to cigarette smoke and even

moderate exposure to extreme cold and heat; high humidity; fumes, odors, dusts, and gases; soldering fluxes; solvents/cleaners; and chemicals.  Tr. 477.  Dr. Mattar opined that Jacobs' impairments would likely produce good and bad days and Jacobs would likely be absent about three days per month.  Tr. 477.

### ***Dr. Sivaraman***

In an undated letter, Dr. Sivaraman set forth Jacobs' diagnoses of SLE and rheumatoid arthritis and indicated Jacobs was on various medications and needed to remain on prednisone due to her frequent flare ups.  Tr. 643.  Dr. Sivaraman stated that Jacobs had "difficulty w/routine daily activities secondary to joint pain and swelling."  Tr. 643.

#### *State agency reviewing opinions*

On October 19, 2014, state agency reviewing physician Leanne M. Bertani, M.D., completed a physical RFC Assessment.  Tr. 85-87.  Dr. Bertani opined that Jacobs had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 4 hours in an 8-hour workday, 30 minutes at a time; sit about 6 hours in an 8-hour workday; and limited to frequent pushing/pulling with bilateral upper and lower extremities.  Tr. 85-86.  Dr. Bertani opined that Jacobs could never climb ladders/ropes/scaffolds; and would be limited to occasionally climbing ramps/stairs, crouching or crawling and frequently stooping and kneeling. Tr. 86.  Dr. Bertani opined that Jacobs would be limited to frequently handling and fingering with her bilateral upper extremities.  Tr. 86-87.  Dr. Bertani opined that Jacobs would need to avoid concentrated exposure to extreme cold and hazards (machinery, heights, etc.).  Tr. 87.

Upon reconsideration, on March 11, 2015, state agency reviewing physician Leigh Thomas, M.D., completed a Physical RFC Assessment, reaching the same opinions as Dr. Bertani.  Tr. 119-122.

**C.**     **Hearing testimony**

**1.**     **Plaintiff's testimony**

Jacobs testified and was represented at the hearing.  Tr. 31-51.  Jacobs explained that her daughters assist her with getting dressed, e.g., pulling her boots up, pulling her clothes on, and snapping and zipping things.  Tr. 32.  They help Jacobs with chores around the house.  Tr. 32. Jacobs indicated her daughters are pretty independent.  Tr. 32.  Jacobs tries to do some chores around the house but she is not able to do as much as she would like.  Tr. 32-33.  Jacobs has never driven because she has never felt comfortable doing so.  Tr. 33.  Jacobs usually has someone drive her where she needs to go and if she could not find someone to drive her she would use public transportation.  Tr. 33.

To relieve her pain, Jacobs takes her medications and sometimes uses a heating pad or an ankle brace.  Tr. 33, 34.  But Jacobs indicated a lot of times she does not get relief and just has to rest when she has a flare up.  Tr. 33.  Jacobs relayed that her flare ups are unpredictable and she estimated having flare ups as often as three times each week depending on her activities or stress levels.  Tr. 34.  When Jacobs is having a flare up, she gets ulcers in her mouth; it is hard for her to eat; she has a fever; she is fatigued; and she has inflammation in her joints.  Tr. 34.

During the day, Jacobs does not do much – she tries to spend time with her children but her ability to play with them is limited; she reads or watches television; she visits with her mom or her mom comes to see her once in a while; and she occasionally uses a computer tablet for reading or to search for things.  Tr. 35.  Because Jacobs does not drive and does not have the ability to pay for things, Jacobs' children are not involved in a lot of extracurricular activities. Tr. 36.  Jacobs corresponds with her daughters' teachers but only sees them in person about once per year.  Tr. 36.

Jacobs explained that when she was last working in 2013 as a stylist assistant she was having issues with standing, bending and using her hands and wrists due to stiffness and joint pain.  Tr. 39.  Jacobs was not actually fired from her job but she was told to work on getting her own health together and if everything worked out fine Jacobs could return.  Tr. 40.

Jacobs indicated that she received a diagnosis of lupus in May 2014 and was referred to a rheumatologist and also diagnosed with rheumatoid arthritis.  Tr. 41.  Jacobs was started on various medications.  Tr. 42.  Jacobs' conditions affect multiple joints, including wrists, fingers, elbows, knees, neck, lower back, ankles, and feet.  Tr. 42.  Jacobs explained that, like her flare ups, whether a particular joint is affected is unpredictable.  Tr. 42-43.  She has swelling and stiffness in her joints that prevent her from being able to move certain joints.  Tr. 43.  Because of inflammation in her feet, it is hard for Jacobs to be on her feet.  Tr. 43.  She estimated being able to be on her feet for about 15 minutes at a time.  Tr. 43.  She also has problems being in a seated position and estimated being able to sit for about 15-20 minutes at a time.  Tr. 43-44.  Jacobs has to constantly change positions.  Tr. 43, 44.  In order to alleviate her pain, Jacobs lies down.  Tr. 44.  She estimated lying down for about 4-5 hours throughout an 8-hour period to alleviate joint pain.  Tr. 44.  Jacobs has a lot of issues using her hands, including grasping and twisting objects.  Tr. 44-45.  Jacobs has very low energy on a regular day.  Tr. 45-46.  On a day when Jacobs is having a flare up, she is not really able to do anything.  Tr. 46.  She is in so much pain on those days that it is hard for her to even talk.  Tr. 46.  Jacobs has flare ups even when taking her medications.  Tr. 46.

Jacobs feels her condition prevents her from working any job because her flare ups come out of nowhere and, once she has a flare up, she is unable to do much at all – it is even hard for her to get out of bed.  Tr. 50.

### 2.      Vocational expert's testimony

Vocational Expert Daniel Simone ("VE") testified at the hearing.  Tr. 51-56.   The VE described Jacobs' past work as a supply clerk as someone who gets supplies ready and also shampoos and performs different kinds of similar treatments.  Tr. 51-52.  The VE indicated that the position, as described by Jacobs, was a light, semi-skilled position.  Tr. 52.

The ALJ asked the VE to consider a hypothetical individual of Jacobs' age and with her past work and education who is limited to light work, but standing and walking is limited to 4 out of 8 hours for 30 minutes at a time and sitting 6 out of 8 hours; can push and pull frequently with the bilateral upper and lower extremities; can frequently handle and finger with the bilateral upper extremities; can climb ramps and stairs occasionally; can never climb ladders, ropes, and scaffolds; can frequently stoop and crawl; can occasionally crouch and crawl; would have to avoid concentrated exposure to extremes of cold.  Tr. 52-53.  The VE indicated that the described individual would be unable to perform Jacobs' past work because it would require standing more than 4 hours per day.  Tr. 53.  The VE indicated that there would be other jobs that the individual could perform, including marker, router, and cashier or cashier II.  Tr. 53. The VE provided job incidence data for each of the identified jobs, reducing the number of the casher or cashier II positions due to the standing limitation of 4 hours per day.  Tr. 53-54.  The VE also testified that, if an individual was unable to sit, stand or walk more than a total of 4 hours out of an 8-hour workday, there would be no work.  Tr. 56.  Also, if an individual was absent from work 3 days per month on a regular basis, there would be no work.  Tr. 56.  And the VE indicated that, absent an accommodation, there were no jobs that would allow for periods of lying down during a workday excluding breaks and lunch.  Tr. 56.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the
national economy.

20 C.F.R. § 404.1520;[5]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107

S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In her February 23, 2017, decision, the ALJ made the following findings:[6]

1.    Jacobs meets the insured status requirements of the Social Security Act
      through December 31, 2016.  Tr. 17.

2.    Jacobs has not engaged in substantial gainful activity since January 16,
      2014, the alleged onset date.  Tr. 17.

3.    Jacobs has the following severe impairments: systemic lupus
      erythematosus (SLE) and inflammatory arthritis. Tr. 17-18.  Jacobs alleged
      mental limitations but there is no evidence of a medically determinable
      mental impairment.  Tr. 17-18.

4.    Jacobs does not have an impairment or combination of impairments that
      meets or medically equals the severity of the listed impairments.  Tr. 18.

5.    Jacobs has the RFC to perform light work as defined in 20 C.F.R. §
      404.1567(b) with additional limitations.  Tr. 18-22.  Jacobs can stand
      and/or walk for a total of 4 hours in an 8-hour day, for 30 minutes at a time,
      and can sit 6 hours in an 8-hour day; she can push and pull frequently with
      the bilateral upper extremities and bilateral lower extremities; she can
      frequently handle and finger with the bilateral upper extremities; she can

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances,
citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations
found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq.,
corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. §
416.920).

[6] The ALJ's findings are summarized.

occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; she can frequently stoop and kneel and occasionally crouch and crawl; and she must avoid concentrated exposure to extremes of cold.  Tr. 18-22.

6.     Jacobs is unable to perform any past relevant work.  Tr. 22.

7.     Jacobs was born in 1987 and was 26 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 22.

8.     Jacobs has a limited education and is able to communicate in English.  Tr. 22.

9.     Transferability of job skills is not material to the determination of disability.  Tr. 22.

10.    Considering Jacob's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Jacobs can perform, including marker, router, and cashier II.  Tr. 22-23.

Based on the foregoing, the ALJ determined that Jacobs had not been under a disability, as defined in the Social Security Act, from January 16, 2014, through the date of the decision. Tr. 23.

## V. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The undersigned recommends that the Court AFFIRM the Commissioner's decision**

Jacobs argues the ALJ failed to adhere to the treating physician rule when weighing the opinion of her treating rheumatologist Dr. Mattar and erred by failing to consider whether there was a closed period of disability, i.e., for the period of time from the alleged onset date through Jacobs' self-reported improvement in her symptoms in June 2016 after starting Xeljanz. Doc. 15, Doc. 19.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). The "procedural 'good reasons' rule serves both to ensure the adequacy of review and to permit the claimant to understand the disposition of [her] case." *Miller v. Berryhill*, 2018 WL 3043297, * 7 (E.D.Mich., May 29, 2018)(quoting *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 550-51 (6th Cir. 2010)), *report and recommendation adopted*, 2018 WL 3036340 (June 19, 2018).

A claimant may be entitled to disability benefits for a closed period. *Lang v. Sec. of Health & Human Servs.*, 875 F.2d 865, * 2 (6th Cir. 1989) (unpublished) (relying on *Myers v. Richardson*, 471 F.2d 1265 (6th Cir. 1972)); *Hall v. Colvin*, 2017 WL 111926, * 2 (E.D. Ky. Jan.

11, 2011) (same); *Widener v. Astrue*, 2009 WL 2778215, * 5 (E.D. Ky. Aug. 27, 2009) (same).

However, reversal and remand is not always required for consideration of whether a closed

period is warranted.  *Compare Hall*, 2017 WL 111926, * 2-3 (remand not warranted) and *Wells*

*v. Comm'r of Soc. Sec.*, 2009 WL 648603, * 7 (S.D. Ohio Mar. 10, 2009) (ALJ did not err in

failing to award closed period benefits) *with Lang*, 875 F.2d 865, * 2 (remand warranted) and

*Widener*, 2009 WL 2778215, * 5 (remand warranted).

> The ALJ considered and weighed Dr. Mattar's opinion, stating:
>
> Dr. Mattar, the claimant's treating rheumatologist, opined in June 2016 that the claimant was able to sit, stand, and walk less than 2 hours in an 8 hour workday and could lift and carry 10 pounds frequently and 20 pounds occasionally (Ex. 8F). Although Dr. Mattar was a treating source with expertise in the claimant's condition, his opinion was written prior to the claimant beginning Xeljanz, which resulted in significant improvement (Ex. 10F/1). This opinion was formed at the beginning of Xeljanz use such that it does not reflect her improved, treated capacities, and therefore has a somewhat diminished persuasiveness and is not given controlling weight.

Tr. 21.

Jacobs contends that the ALJ's analysis of Dr. Mattar's opinion did not satisfy the

treating physician rule.  She argues that the ALJ should have given the opinion controlling

weight; the ALJ failed to apply the regulatory factors after not assigning controlling weight to

the opinion; and the ALJ failed to articulate sufficient reasons for not assigning controlling

weight or did not sufficiently articulate what weight was assigned to the opinion.  Doc. 15, p.

16.

Jacobs also complains that the ALJ did not address why Dr. Mattar's opinion, which was

authored prior to Jacobs starting on Xeljanz, was not entitled to controlling or substantial weight

for the period of time between the alleged onset date and Jacobs' self-reported improvement in

her symptoms in June 2016.  Doc. 19, pp. 5-7.  She contends that, if the only reason the ALJ

discounted Dr. Mattar's opinion was that it was authored after improvement in Jacobs' condition, the ALJ should have considered whether Jacobs was entitled to a closed period of disability.

Consistent with the regulations, the ALJ considered and weighed Dr. Mattar's opinion. The ALJ explained why she did not assign controlling weight to Dr. Mattar's opinion, i.e., it did not account for an improvement in Jacobs' condition following introduction of Xeljanz.  Jacobs contends that the ALJ never concluded that the opinion was inconsistent with the medical evidence or not well-supported by acceptable diagnostic techniques.  However, the ALJ's explanation does make clear that the ALJ concluded that the very restrictive limitations contained in Dr. Mattar's opinion, i.e., sitting, standing or walking less than 2 hours in an 8-hour workday, were not consistent with Jacob's improvement following introduction of Xeljanz.

Jacobs also contends that that ALJ failed to apply any of the regulatory factors contained in 20 C.F.R. § 404.1527(c), i.e.,  length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, the specialization of the source, and any other factors that tend to support or contradict the opinion, when weighing Dr. Mattar's opinion and that the ALJ did not sufficiently explain exactly what weight was assigned to the opinion.  As indicated above, an ALJ is not required to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis*, 414 Fed. Appx. at 804.  Nevertheless, the ALJ took into account the nature and extent of the treatment relationship as well as Dr. Mattar's specialization and the supportability and consistency of the opinion with the record as a whole.  The ALJ explained that the opinion was

not reflective of Jacobs' improved condition.   Jacobs does not dispute that her condition

improved after starting Xeljanz.  Doc. 19, pp. 3, 5.  Moreover, the ALJ did not wholly discount

the opinion.  The ALJ concluded the opinion had "somewhat diminished persuasiveness."  Tr.

21.  Jacobs contends that this statement is not sufficient articulation of the weight assigned.  The

undersigned disagrees and finds that the ALJ's explanation allows for meaningful review and

that reversal and remand is not warranted for further treating physician analysis.

In addition to arguing that the ALJ's articulation of the weight assigned to Dr. Mattar's

opinion was insufficient, Jacobs argues that the ALJ erred by not addressing why Dr. Mattar's

opinion, which was authored prior to Jacobs starting on Xeljanz, was not entitled to controlling

or substantial weight for the period of time between the alleged onset date and Jacobs' self-

reported improvement in her symptoms in June 2016.  Doc. 19, pp. 5-7.  She contends that, if

the only reason the ALJ discounted Dr. Mattar's opinion was that it was authored after

improvement in Jacobs' condition, the ALJ should have considered whether Jacobs was entitled

to a closed period of disability.

The undersigned finds that reversal is not warranted for consideration of whether a

closed period of disability was warranted.  Jacobs argues in a conclusory fashion that "the

evidence of record supports Dr. Mattar's opinion that prior to [June 2016] Plaintiff would be

limited to a total of two hours per day of sitting, standing and walking, and that her

'unpredictable' flare-ups would cause her to be absent from work anywhere from 1-3 days per

month."  Doc. 15, p. 17.  However, the ALJ's decision as a whole makes clear that, in addition

to finding that Jacobs' condition improved following introduction of Xeljanz, the ALJ did not

find that the record supported the degree of limitation alleged by Jacobs or set forth in Dr.

Mattar's opinion for the whole period under review.  For example, the ALJ considered the

objective clinical signs and laboratory findings, which included evidence of full strength, normal gait and station, normal range of motion, no focal neurological deficits.  Tr. 19.  Also, the ALJ considered Jacobs' own reports and treatment history which showed improvement in her condition with medication, even prior to introduction of Xeljanz in June 2016.  Tr. 20.  In recounting Jacobs' treatment history, the ALJ noted a period of active disease in late 2015 and early 2016 before obtaining control with medication management but concluded that the record demonstrated that her condition improved with and was controlled with medication.  Tr. 20-21. The ALJ also considered other opinion evidence, including state agency reviewing physician Dr. Thomas's March 11, 2015, opinion, which limited Jacobs to light exertional work with standing and/or walking up to 4 hours a workday, 30 minutes at a time and frequent pushing and pulling with the upper and lower extremities and postural and exertional limitations.  Tr. 21, 108-111.  The ALJ concluded that Dr. Thomas's opinion was consistent with the record as it existed at the time of review and noted that Jacobs' subsequent improvement with use of Xeljanz further supported an ability to perform a reduced range of light work.  Tr. 21.

Here, the ALJ considered and weighed the record evidence both prior to and after Dr. Mattar's June 19, 2016, opinion and, in doing so, concluded that the evidence did not support a finding of disability for the entire period.  Although the ALJ did not directly address whether there should be a closed period of disability, Jacobs has not shown that the ALJ's decision is not supported by substantial evidence.  Thus, the undersigned finds that reversal and remand is not warranted for consideration of whether the ALJ should have found a closed period of disability. *See e.g., Hall*, 2017 WL 111926, * 3 (affirming Commissioner's decision even though the ALJ did not specifically address whether the plaintiff was entitled to a closed period of disability because there was substantial evidence to support the ALJ's decision not to award benefits,

even for a temporary period); *Wells*, 2009 WL 648603, * 7 (finding ALJ did not err in failing to award closed period benefits).

## VI. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

March 18, 2020

/s/ Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).